## APPEAL OF CROSS MOUNTAIN COAL CO.

Docket No. 1219. Submitted June 2, 1925. Decided September 9, 1925.

> Upon the evidence submitted, *held:* (1) That the taxpayer is entitled to paid-in surplus of $50,000 in respect of property paid in on January 27, 1914, for $200,000 par value of stock; and (2) that promissory notes amounting to $48,000 paid in for stock of the Volunteer Coal Co., a subsidiary of the taxpayer, on October 23, 1917, constituted invested capital of the taxpayer from the date paid in to the extent of their face value.

*J. G. Schurz, C. P. A.*, for the taxpayer.
*A. J. Seaton, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of deficiencies in income and profits taxes for the calendar years 1917 to 1922, inclusive, in a total amount of $64,555.89, arising from the reduction by the Commissioner of the claimed value of property paid in for stock, the disallowance of a claimed paid-in surplus of $50,000 in respect of property paid in for stock of the taxpayer on January 27, 1914, and the exclusion from invested capital of promissory notes paid in for stock amounting to $48,000.

### FINDINGS OF FACT.

Taxpayer is a corporation organized January 7, 1914, under the laws of the State of Tennessee, with principal place of business at Knoxville. On January 27, 1914, it purchased from E. D. Attix, trustee, as of January 1, 1914, certain coal-mining properties situated in Anderson County, Tenn., paying therefor shares of its own

stock of the par value of $200,000. The mining properties thus purchased were taken up on the books of taxpayer at $200,000.

The properties of the taxpayer consist of three leases, store merchandise, accounts receivable, mining supplies, miners' houses and all necessary mine equipment, including a mine entry with airways and cross-cuts approximately 8,000 feet in length. This property was previously owned by the Knoxville Iron Co., a corporation organized in 1868, the principal business of which was the manufacture of bar iron. To operate this company it was necessary that a continuous supply of coal should be provided for. Accordingly the Knoxville Iron Co. leased and developed the property now owned by the taxpayer, supplying its own needs first and placing the surplus on the market. About the middle of 1903 an explosion occurred in the mine of another company adjoining that of the Knoxville Iron Co., in which explosion 184 men and boys were killed. At a meeting of the directors of the Knoxville Iron Co., held January 26, 1904, the following resolution, among others, was adopted:

On motion the attorneys for the company were requested to investigate and report at the next meeting as to the feasibility of having two separate charters, one for the coal mining and one for the rolling mill interests.

During December, 1911, an explosion occurred in the Knoxville Iron Co.'s coal mine, killing 96 men and injuring many others. Damage suits in excess of one and a quarter million dollars were instituted against the Knoxville Iron Co. These damage suits were finally compromised and settled for approximately $125,000, which amount was realized from the sale of mortgage bonds covering the Knoxville Iron Co.'s entire properties.

Following this explosion the stockholders of the Knoxville Iron Co. decided to separate the two branches of its business in order that the milling part might not again be jeopardized by a recurrence of an explosion in the coal mine. Accordingly, its attorneys were directed to take necessary legal steps to effect this proposed separation so that each industry might be held accountable in the future for its own liabilities. As a result, the Cross Mountain Coal Co., the taxpayer, was organized with a capital stock of the par value of $200,000. The transfer of the coal mine by the Knoxville Iron Co. to the new corporation was effected through the mediation of one E. D. Attix, as trustee, who with his associates paid the Knoxville Iron Co. $75,000 for all of its coal-mining properties and in turn transferred them to the taxpayer for its entire issue of capital stock, under a written proposition dated December 30, 1913, to the Knoxville Iron Co. This proposition was incorporated in the minutes of the tax-

payer's board of directors authorizing the purchase of the property, as follows:

KNOXVILLE IRON COMPANY,
         *Knoxville, Tenn.*

GENTLEMEN: Representing, as Trustee, myself and certain other interests, I hereby propose to give and do hereby bid for all the properties of said company situated in Anderson County, Tennessee, as advertised for sale by the said Knoxville Iron Company, and known as the Cross Mountain Mine, and all the properties of said Knoxville Iron Company in Anderson County, of every kind, character and description used in connection therewith, or incident thereto, the sum of Seventy Five Thousand dollars, ($75,000.00), to be paid on or before Feb. 28th, 1914: Provided, however, if this proposition shall be accepted, the Knoxville Iron Company must secure an agreement for the ratification and confirmation by the Coal Creek Mining & Manufacturing Company of the transfer of the leases made by it ·to said Knoxville Iron Company, covering said Cross Mountain Mine—said confirmation or ratification to be in writing and to be approved by my attorney—otherwise and failing to secure said ratification, this proposition shall be null and void.

If this proposition is accepted, it is the intention of myself and those interested with me, to organize a corporation under the laws of the State of Tennessee, to be known as the CROSS MOUNTAIN COAL COMPANY, for the purpose of operating and developing said property, and such other properties as may be acquired, and to carry on a general mining business in connection with such properties; I do hereby agree to give to each stockholder of said Knoxville Iron Company the preferential right to subscribe for the stock of the new company, VIZ:—The said CROSS MOUNTAIN COAL COMPANY, in an amount proportioned to his or her present holdings of stock in the Knoxville Iron Company, and upon the same basis as myself and associates, Provided, however, said subscription be made in writing, addressed to me, or said CROSS MOUNTAIN COAL COMPANY on or before the 24th day of January, 1914, and the amounts so subscribed shall be paid in cash to me, as Trustee, or to said CROSS MOUNTAIN COAL COMPANY on or before the 28th day of February, 1914; Provided, further that if this proposition is accepted it become effective as of January 1, 1914.

Respectfully submitted.

                     E. D. ATTIX, *Trustee.*

Thereupon Mr. E. D. Attix, as Trustee, appeared before the Board and stated that, under an agreement between him as Trustee and the Knoxville Iron Company, he had the right or option to purchase, or have the same conveyed to his assignee, all of the properties of said Knoxville Iron Company lying in Anderson County, Tennessee, including what is generally known as the Cross Mountain Mine, and all the property of every kind, character and description, real, personal, and mixed, which has been used by said Knoxville Iron Company in connection with the operation of said Cross Mountain Mine and as appertaining to its mining business in Anderson County, and the said E. D. Attix, as Trustee, proposed to sell and have conveyed by the said Knoxville Iron Company to the Cross Mountain Coal Company, all of said properties in consideration and for the entire capital stock of said Cross Mountain Coal Company, that is, its entire capital stock of the par value of $200,000.00.

Whereupon, upon motion of Mr. Sullivan, seconded by Mr. Schaad, the following resolution was adopted by the unanimous votes of all the directors of the company, to-wit:

Be it resolved, that the proposition of E. D. Attix, Trustee, to sell and have conveyed by the Knoxville Iron Company to the Cross Mountain Coal Company all of the properties formally owned by the Knoxville Iron Company in Anderson County, Tennessee, including the Cross Mountain Mine and all the property of every kind, character, and description, real, personal and mixed, appurtenant to said properties or used in connection therewith by the said Knoxville Iron Company, be and the same is hereby accepted and the officers of this company are directed to issue the entire capital stock of the company to the said E. D. Attix, Trustee, or to his order, upon the delivery of the deed to Cross Mountain Coal Company covering said property duly executed and acknowledged for registration by the said Knoxville Iron Company. Thereupon the meeting adjourned.

(Signed)          McCLOUD, <i>Chairman.</i><br>
E. D. ATTIX, <i>Secy.</i>

This January 27th, 1914.

It was not the intention of the directors and stockholders of the Knoxville Iron Co. that the coal-mining properties should fall into the hands of outside parties, and in effecting the sale they guarded against such a possibility. The plan was that substantially the same stockholders should own and operate the two properties, but under separate charters. The Knoxville Iron Co. still needed an uninterrupted supply of coal and did not intend to lose control of the coal-mining property. The plan devised and carried out was to advertise the mine interest for sale, reserving the right to reject any and all bids. The bid submitted by E. D. Attix was the only bid submitted for the purchase of the coal properties. To carry out the proposed agreement submitted in the bid by E. D. Attix, stock in taxpayer corporation was offered to the stockholders of the Knoxville Iron Co. proportionately to their holdings in that company. About 75 per cent of the stockholders of the Knoxville Iron Co. subscribed for stock in the taxpayer corporation. The other 25 per cent of the stockholders in the Knoxville Iron Co. although offered the stock did not subscribe for it. It was not considered that the amount paid by E. D. Attix, as trustee, to the Knoxville Iron Co. for the coal-mining properties represented the true and full value of the mine. The reason for a greater amount not being decided upon can not now be ascertained, as the managing directors, as well as the attorney who effected the transfer, are either dead or incapacitated. It is shown, however, by records and statements made by them, that the price paid was not considered material and that it was not expected that the taxpayer's property would pass out of the control of the stockholders of the Knoxville Iron Co. The taxpayer continued to deliver coal to the Knoxville Iron Co., supplying its entire needs exactly as had been done previous to the separation and before any surplus was placed on the market.

The opening balance sheet of the taxpayer was as follows:

ASSETS

| | |
|---|---|
| Store cash | $456. 65 |
| Store merchandise | 8, 040. 04 |
| Store accounts receivable | 656. 66 |
| Store leases | 1, 110. 15 |
| Prepaid insurance | 82. 11 |
| Prepaid insurance | 172. 01 |
| Mine supplies | 4, 336. 70 |
| · Oil | 285. 78 |
| Feed | 994. 78 |
| Lumber and props | 1, 082. 50 |
| Real estate | 6, 500. 00 |
| Mine construction accounts | 151, 310. 97 |
| Coal lease | 25, 000. 00 |
| | 200, 058. 35 |

LIABILITIES

| | |
|---|---|
| Store coupons (outstanding) | 58. 35 |
| Capital stock | 200, 000. 00 |
| | 200, 058. 35 |

The transfer of the properties to the taxpayer was made as of January 1, 1914. At that time the Knoxville Iron Co. was operating this property under three leases dated, respectively, 1888, 1889, and 1900, the first two being for 30 years each and the third for 50 years. The mines had been developed under these leases by a main entry and its necessary accessories at a cost in excess of $90,000. An inventory taken at December 31, 1913, showed store merchandise, store accounts receivable, and cash of over $10,000; mine supplies in excess of $6,000; real estate valued at $6,500; and mine construction consisting of 113 tenant houses, mine railroad, and all necessary machinery priced at approximately $160,000. The leasehold representing the partially worked rooms where but one-third of the coal had been extracted, which left the remainder easily accessible, was valued at $25,000. By actual inventories the property was valued at approximately $300,000. The actual cash value of the property at the time paid in for $200,000 par value capital stock was $250,000.

The average net annual income derived from the coal properties for the 12 years, 1901 to 1912, was $27,427.35, and for the 7 years, from 1914 to 1920, the average net annual income was $36,879.76.

It was stipulated that the rate of depreciation allowed by the Commissioner should be used in computing depreciation upon the value determined by the Board.

In 1917 the Government war regulations with reference to transportation came into effect, and it was difficult for the taxpayer to secure sufficient cars to move its coal. The stockholders of the taxpayer, therefore, formulated a plan to organize a new coal company, to be known as the Volunteer Coal Co., as an entirely separate entity, hoping by this means to secure a greater supply of coal cars. The authorized capital of the Volunteer Coal Co. was $100,000. As all of the cash was not needed immediately, the company accepted as part payment for stock $48,000 in demand interest-bearing negotiable notes of solvent makers, which notes were worth their face value. These notes were accepted with the view that the amounts represented thereby would be used from time to time in developing the mine. It was found in 1918, after repeated trials, that the additional cars could not be procured, due to the fact that the supply of cars was based upon the previous output of the mine.

The object for which the new company was organized having failed, it surrendered its charter and returned the notes to the makers and the remainder of its property to the taxpayer, pursuant to the following resolution adopted July 23, 1918:

Now THEREFORE Be it and it is hereby resolved and voted by this stockholders meeting, Nine Hundred Eighty-four (984) out of a total issue of One Thousand (1,000) Shares outstanding of this company being represented either in person or by proxy and voting in favor of this resolution:

1. That the outstanding stock of this company be reduced from One Hundred Thousand ($100,000.00) Dollars to Fifty-two Thousand ($52,000.00) Dollars, par value.

2. That the outstanding stock of this company which was sought to be paid for by notes, to-wit, Forty-eight Thousand ($48,000.00) Dollars, par value, and which is pledged to this Company to secure payment of said several notes, amounting in the aggregate to Forty-eight Thousand ($48,000.00) Dollars, be recalled and cancelled.

3. That in consideration of the surrender by the holders thereof, for cancellation, of certificates of stock now outstanding of this Company in the amounts of their respective notes to this company, amounting in the aggregate to Forty-eight Thousand ($48,000.00) Dollars, be cancelled and surrendered.

4. That the officers of this company are authorized and instructed to do and perform all acts necessary to carry this resolution into effect.

WHEREAS This Company has this day, by resolutions passed, and adopted by this meeting, authorized and approved the giving of an option of sale of all of the assets of this company, and has likewise authorized the distribution of the proceeds of such sale among the stockholders, as a liquidation distribution of the assets of this Company.

Be it and it is hereby resolved and voted by the stockholders of the Volunteer Coal Company, in special meeting duly called and held, that if said option shall be exercised, and if, and when, said sale shall be consummated, it is the desire of the stockholders to surrender the charter and dissolve the corporation, and the President and Secretary of the corporation are authorized and directed to file in the office of the Secretary of State a sworn certificate show-

ing the adoption by the stockholders of such resolution aforesaid, and that the expense incident to preparing and filing such certificate be paid out of the Treasury of this Company.

In computing the tax for the years in question the Commissioner reduced the valuation of taxpayer's assets paid in on January 27, 1914, for depreciation and invested capital purposes, to $75,000. No evidence of value was submitted by the Commissioner. He also questioned the *bona fides* of the notes given by the stockholders of the Volunteer Coal Co. and excluded them in computing the consolidated invested capital.

## DECISION.

The deficiencies should be computed in conformity with the following opinion. Final determination will be settled on consent or on 10 days' notice, in accordance with Rule 50.

## OPINION.

LITTLETON: The issues involved in this appeal are: (1) The amount which the taxpayer may include in invested capital as the actual cash value of property paid in for stock on January 27, 1914, and (2) whether the interest-bearing demand promissory notes paid in for $48,000 of stock of the Volunteer Coal Co. should have been included in invested capital from the date paid in until the dissolution of the corporation.

Prior to January 1, 1914, the Knoxville Iron Co. was the owner of the Cross Mountain Coal Mine, but, owing to a disastrous explosion therein during the year 1911, the officers and stockholders of the Knoxville Iron Co. decided to segregate the two branches of its business in order that the milling part of the business might not again be jeopardized by the possible recurrence of an explosion in the coal mine. The transfer of the property from the Knoxville Iron Co. to the taxpayer corporation was effected through the medium of E. D. Attix, who purchased the property from the Knoxville Iron Co. for $75,000 and immediately thereafter transferred this same property to taxpayer corporation for the entire amount of its $200,000 capital stock.

Under section 207 (a) (2) of the Revenue Act of 1917, invested capital, so far as this appeal is concerned, is the actual cash value of tangible property paid in other than cash for stock or shares in such corporation or partnership, at the time of such payment. The 1918 Act and the 1921 Act, regarding invested capital as affecting this appeal, contain substantially the same provisions as section 207 of the 1917 Act.

It is, therefore, necessary for the taxpayer to establish the actual cash value of the property acquired as of January 1, 1914, in order to substantiate its claim for invested capital and paid-in surplus.

The evidence in this appeal shows that prior to the organization of the taxpayer the Knoxville Iron Co. had operated the property as a part of its business. In 1903 there was a disastrous explosion in the mine of another company adjoining that of the Knoxville Iron Co. Early in 1904 the Knoxville Iron Co. was considering the feasibility of separating its business into two corporations. In 1911 an explosion occurred in its mine in which 96 men were killed and many others injured. Soon after this explosion the stockholders of the Knoxville Iron Co. directed the company's attorney to take the necessary legal steps to effect a separation of the coal and milling interests in order that the milling part of the business should not be held liable in the event of another explosion in the mines. It was not the intention of the directors of the Knoxville Iron Co. that the mining properties should pass into the hands of outside interests. In effecting the sale they guarded against such a possibility, the plan being that substantially the same stockholders should own and operate the two companies, but under separate charters. The plan finally devised was to advertise the mining interests for sale, reserving, however, the right to reject any and all bids. E. D. Attix, trustee, acting as a medium, submitted the only bid. His proposal stated that the stock in the new company should be offered to the stockholders of the Knoxville Iron Co. proportionately to their holdings in that company. Approximately 75 per cent of the stockholders of the iron company subscribed; the remaining 25 per cent, fearing another explosion in the mine, did not subscribe and did not become stockholders in the new company. The amount of $75,000 paid by Attix to the Knoxville Iron Co. for the mining properties was not considered as representing the true value of the property. The evidence shows that the directors of the Knoxville Iron Co. did not consider the price offered by Attix as material, since the property would not pass from the control of the stockholders of the Knoxville Iron Co.

At the time the property was acquired by the taxpayer a physical inventory was taken which showed a value of approximately $300,000. The mine was completely developed with only 16.2 per cent of the recoverable tonnage removed, leaving the recoverable tonnage on January 1, 1914, at 8,046,605 tons. The valuation of the properties acquired by the taxpayer for $200,000 of capital stock was made by a mining engineer thoroughly familiar with the coal lands in that territory and who for several years had been engaged in operating and superintending mines. In addition to this evidence, George H. Camp, for more than 30 years actively engaged in the development and operation of coal mines, who for many years has operated a coal mine adjoining that of the taxpayer, and who was thoroughly familiar with the taxpayer's property as well as with the

value of mine properties generally in that territory, gave as his opinion that the fair cash value of the taxpayer's property from an investment standpoint, taking into consideration the marketing of the coal, its quality, and the cheapness of operating the seam, was $250,000, and that this amount would be a fair value for a purchaser to pay. Mr. Camp is a competitor of the taxpayer and has no interest in the business of the taxpayer or that of the Knoxville Iron Co.

The transfer of the property from the Knoxville Iron Co. to the taxpayer was an intracompany transaction and the sale to E. D. Attix, trustee, was only a means of transferring the coal properties to a separate corporation to be owned by the same interests which owned the property before it was transferred.

From all of the evidence submitted, the Board is of the opinion that the property paid in for the stock of the taxpayer on January 27, 1914, had an actual cash value on January 1, 1914, and on the date paid in, of $250,000, and that the taxpayer is, therefore, entitled to a paid-in surplus in respect of this property in computing invested capital for the years involved of $50,000.

The second question is whether the interest-bearing demand promissory notes, amounting to $48,000, paid in on October 23, 1917, for stock of the Volunteer Coal Co. should have been included in invested capital. In 1917, owing to the Government war regulations, it became difficult for the taxpayer to secure sufficient cars to remove its coal. Its officers formulated the plan of organizing a new coal company, known as the Volunteer Coal Co., hoping by this means to secure a greater supply of coal cars. This company was incorporated at $100,000. It accepted as part payment for stock $48,000 in demand interest-bearing notes of the following persons:

| | | | |
|---|---|---|---|
| E. D. Attix | $2,208 | S. C. Hoskins | $480 |
| Anna Upjohn | 480 | Mrs. W. P. Davis | 1,920 |
| W. R. Stephenson | 624 | W. P. Davis | 1,920 |
| E. W. Ogden | 768 | H. W. Van Benschoten | 2,400 |
| F. C. Ogden | 768 | O. A. Brown | 1,104 |
| Minnie C. Ewing | 1,200 | W. H. Van Benschoten | 12,336 |
| R. A. Clifford | 480 | Lizzie Van Benschoten | 720 |
| L. C. Clifford | 480 | A. K. Van Benschoten | 960 |
| M. Chamberlain | 1,200 | Ethel Van Benschoten | 1,440 |
| H. S. Chamberlain, jr | 1,200 | W. A. Van Benschoten | 1,200 |
| Estate of H. S. Chamberlain | 13,488 | | |
| P. F. Lynch | 624 | | 48,000 |

These notes were all payable on demand and bore interest at the rate of 6 per cent. The notes were taken instead of cash for the reason that it was not definitely known how much money would be required to develop the mine, such development depending largely upon the ability to secure coal cars. The plan was to demand payment on the notes from time to time in such amounts as were needed

to operate the mine. Each of the makers of the notes was entirely solvent and responsible and fully able at all times to pay the amount of his respective note upon demand. The notes were *bona fide* paid in for stock and the actual cash value thereof was equal to their face value. In 1918, after repeated trials, the taxpayer found that additional cars could not be procured, inasmuch as the car supply was based upon prior production of the mine. The object for which the Volunteer Coal Co. was organized having failed, it surrendered its charter, canceled the notes, and returned the remainder of its property to the taxpayer.

In computing the invested capital of the taxpayer these notes, paid into its subsidiary for the latter's capital stock, should have been included therein at their face value from the date paid in. *Appeal of Hewitt Rubber Co.*, 1 B. T. A. 424; *Appeal of American Steel Co.*, 1 B. T. A. 839.

ARUNDELL not participating.